# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### October 2, 2012 Session

## STATE OF TENNESSEE v. JERECO TYNES

**Appeal from the Criminal Court for Shelby County**
**No. 10-02861    James Lammey, Judge**

---

**No. W2010-02511-CCA-R3-CD  - Filed March 13, 2013**

---

**Tenn. R. App. P. 3 Appeal as of Right; Judgments**
**of the Criminal Court Affirmed in Part,**
**Reversed in Part; Remanded**

Jereco Tynes ("the Defendant") was convicted by a jury of one count of first degree felony murder; one count of attempted aggravated robbery; one count of aggravated robbery; and one count of theft of property between $10,000 and $60,000. The trial court sentenced the Defendant to life imprisonment for the murder and, after a hearing, to a consecutive term of five years for the attempted aggravated robbery; a consecutive term of eight years for the aggravated robbery; and a concurrent term of four years for the theft, for an effective sentence of life plus thirteen years. In this direct appeal, the Defendant contends that the trial court erred by (1) admitting into evidence proof that the Defendant had been in a homosexual relationship; (2) prohibiting defense counsel from cross-examining two co-defendants about their sentence exposure; (3) instructing the jury that evidence of a confession had been admitted; (4) failing to instruct the jury as to certain lesser-included offenses; and (5) imposing consecutive sentences. The Defendant also challenges the sufficiency of the evidence as to all of his convictions. We have determined that the trial court committed reversible error by failing to instruct the jury on a lesser-included offense of theft of property over $10,000. Accordingly, we must reverse the Defendant's conviction of theft over $10,000 and remand that charge for a new trial. As to the Defendant's remaining issues, we find no reversible error. Accordingly, the trial court's judgments are otherwise affirmed.

JEFFREY S. BIVINS, J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS and ROGER A. PAGE, JJ., joined.

Lance R. Chism (on appeal) and Gregg Carman (at trial), Memphis, Tennessee, for the appellant, Jereco Tynes.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel E. Willis, Senior Counsel; Amy Weirich, District Attorney General; and Jennifer Nichols, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Factual and Procedural Background

The Defendant was indicted for the first degree felony murder of Jose Sanchez;[1] the attempted aggravated robbery of Jose Sanchez; the aggravated robbery of Michael Stack; and the theft of property valued between $10,000 and $60,000 from Michael Stack; all committed in December 2008. At the Defendant's jury trial, conducted in June 2010, the following proof was adduced:

Michael Lee Stack testified that he was an obstetrician/gynecologist living and working in Memphis, Tennessee. At about 8:30 p.m. on December 22, 2008, he was going to the gym to work out. He parked where he usually did, in a lot about one block from the gym. He was driving a loaner car because his car was at the shop. The car he was driving was a 2009 Cadillac STS sedan, worth more than $10,000.

After he parked the car, Stack walked toward the gym down an alleyway. About one-quarter of the way down the alley, he heard someone behind him call, "Stop." When he turned around to look, he "saw someone come at [him] rapidly with a gun in their hand." The gunman said, "Don't fuckin' move." Stack stood in place and three other people came up to him. The gunman said, "Give me everything you've got." Stack stated that he "was scared" but determined to "stay cool and just do what they said." Because he was preparing to work out and was wearing scrub pants, Stack had his belongings in his hand: a Louie Vuitton credit card wallet, his Blackberry cell phone, his iPod, and his car keys. He handed these items over, and the men patted him down to see if he had anything else on him.

The three men, other than the gunman, then ran off. The gunman continued to point the gun at Stack's head for, he stated, twenty to thirty seconds. Stack said, "Please don't hurt me," and the gunman ran off. Stack entered the gym and called the police. They arrived and he explained what had happened. One of the officers drove him to the lot where he had parked the car, and they discovered that the car was gone. The officer then drove Stack home.

---

[1] In the record, and at various places in this opinion, the victim Sanchez is also identified as "Hosea Sanchez" and "Jose Mejia."

About two weeks later, Stack went to the police station to review photographs. He stated that he looked at several photographic arrays, each of which contained multiple photographs. He identified the photograph of one person as the gunman.

On cross-examination, Stack acknowledged that he initially reported to the police that he was accosted by a total of five people. He could not remember to which of the assailants he gave his property. He acknowledged that the persons other than the gunman were wearing "hoodie" sweatshirts. He recalled the gunman wearing a baseball cap. The gun he saw was a black automatic handgun. Stack admitted that the Defendant was not the man he identified from the photographic array. Stack stated that the man he identified was not involved in the attack and acknowledged that his identification was "mistaken."

On redirect, Stack affirmed that, while he initially reported five persons committing the attack, only four were charged. He clarified that, when he said on cross-examination that the person he identified from the photographic array was not involved, he meant that that person was not charged. He identified from the photographic array the person he thought was involved. He also confirmed that the alley where the attack occurred was not well lit and that the men who patted him down had the hoods of their sweatshirts up. When asked if he remembered seeing the Defendant, Stack answered, "Yes."

On further cross-examination, Stack clarified that he remembered the Defendant as one of the men other than the gunman.

Officer Clarence Neal of the Memphis Police Department ("MPD") testified that he responded to the reported robbery with his partner, Officer Dennis Aikens. Officer Neal took Stack's report. After they discovered that Stack's car was missing, Stack called the dealership and the dealership notified OnStar. OnStar notified police dispatch of the car's location. Officers Neal and Aikens and other officers reported to that area and eventually located the car, abandoned. They called for the car to be picked up for processing.

On cross-examination, Officer Neal acknowledged that Stack initially reported that he could give a clear description of only the gunman. As to the other individuals, Stack was able to give only a size description. Officer Neal also acknowledged that no latent fingerprints identified as the Defendant's were recovered from the stolen car.

Lieutenant Frank Winston of the MPD testified that he was a sergeant in December 2008, working at the robbery bureau. He assisted in the investigation of the Stack robbery by showing five photographic arrays to Stack on January 10, 2009. Each array contained six photographs. Stack identified only one photograph from the five arrays.

Lt. Winston also interviewed four suspects, one of whom was the Defendant. On January 11, 2009, he advised the Defendant of his rights, and the Defendant gave a statement. The Defendant's statement was transcribed and admitted into evidence. The statement indicates that the Defendant was twenty years old at the time and had a tenth-grade education. The Defendant stated that he participated in the robbery of Stack, "as a lookout." The other participants were Leandre Lee, Barry McDade, and "Twin." The Defendant denied being armed but stated that Lee and Twin each had a nine-millimeter gun. Stack "gave up a Blackberry cell phone, touch-screen iPod, and his car keys." McDade patted Stack down. The Defendant stated that he received nothing from the robbery. The vehicle used in the robbery was a green car belonging to Lee's grandmother. The Defendant stated that it was Lee's idea to commit the robbery. The Defendant denied seeing a wallet taken from Stack. He stated that Twin drove the Cadillac away and that McDade was in the car with Twin. The Defendant stated that the Cadillac was used in "the murder on Prescott."

The Defendant described Stack's robbery as follows:

> [Lee] had him at gunpoint, [McDade] ran up and patted his pocket. [McDade] really did not have to cause dude was throwing everything that he had at him. They pushed him back towards the door, [McDade] picked up the keys, we walked off towards [Lee's] grandma's car and we pulled off. We started seeing what they had and I told them let me see the keys that they had and they showed me the keys and I told them it was an '09 and they [sic] let's go get it. So we may [sic] u-turn, we rolled past dude was still over there. Twin was pressing the key alarm and the alarm went off. Twin hopped out the car and got in the Cadillac XL or whatever it is and [Lee] asked who was going to ride with him and [McDade] hopped in the car with him. We let them in front of us and we pulled off behind them, rolled it through the hood and went straight to Prescott.

When asked why he participated in the robbery, the Defendant responded, "I don't know."

On cross-examination, Lt. Winston acknowledged that the Defendant's photograph had been in one of the photographic arrays that he showed Stack. Stack, however, did not identify the Defendant. The man identified by Stack as the gunman was named Keith Sutton. Lt. Winston subsequently spoke with Sutton, and he denied any involvement in the robbery. Sutton later was released.

-4-

Leandres Lee[2] testified that he was twenty-one years old. He identified the Defendant and stated that they had known each other for three or four years. He admitted to having participated in a robbery of "[s]ome white guy" in December 2008, together with the Defendant, Barry McDade, and Joe Barton, also known as "Twin." Lee stated that he had been at home when the Defendant and McDade called him to go out. They left in Lee's grandmother's car and Lee drove them downtown. Lee testified that the Defendant, McDade, and Barton jumped out of the car after seeing "the guy." Lee then parked the car. He testified that he "seen them turn the corner through a little alley. So, [he] was following the trail where they were going. And as [he] w[as] following the trail, they came back out running." They told Lee, "We got to go," so they left. Lee stated that he did not know what was going on, that he was just the driver. He denied seeing any guns.

As Lee began driving the men away from the scene, Barton and McDade told Lee to "[t]urn this way." Meanwhile, they were "messing with" some keys they had obtained. Lee saw a light flash on a car, and they told him to stop. Lee did so, and Barton and McDade "got in the stolen car – the Cadillac." They "pulled out," and Lee, accompanied by the Defendant, followed. As they were returning to "the neighborhood," Barton got out of the Cadillac, and the Defendant got in as the driver. Barton joined Lee. The Defendant told Lee, "I know some Mexicans. So trail me." They all drove to Prescott and parked at the apartments.

The four men were walking through the apartments when, according to Lee, the Defendant and McDade saw "a Mexican getting out the car" and "snatched him down." Lee testified:

> As they snatched him down, the Mexican was trying to, like, tussle, get back up. And I was backing up, and I had grabbed Barton and told Barton to stay out of it. We was walking back to the car. Soon I turned around again – heard the gunshot go off, and [the Defendant] hit the man with the gun across his head, and we fled the scene – me and Barton – we had left – I told Barton, "Come on." That [sic] what happened.

Lee stated that he went home. He did not call the police or tell his grandmother what had happened. He testified that he stayed home and that he "was afraid at the time 'cause [he] ain't never seen nothin' happen like that before. [He] was scared." He added that he heard one gunshot.

---

[2] The record includes two different spellings of Lee's first name, "Leandre" and "Leandres."

Lee stated that he had never been to the apartments on Prescott before. He also stated that he did not see a gun until they got to the apartments. He saw the Defendant pull the gun out of his pants. He described the gun as "black." After Lee got back home, the Defendant called him and told him to watch the news. Lee did so and learned the man was dead. Lee tried to call the Defendant. A couple of days later, the Defendant called him. Lee asked him about the gun, and the Defendant told him that he had dropped it. The Defendant also said, "I heard you tellin' folks in the neighborhood about you tellin' about what I did." Lee responded, "What you talkin' about?" and the Defendant told him, "This your game." Lee explained that he took this to mean that the Defendant "was gonna do something to me or something." Lee testified that he had not told anyone about the shooting and that he was testifying because his family had told him "to tell the truth."

Lee also stated that he had turned himself in after he learned that the police were looking for him. At that time, however, he did not tell the police the truth because he was "scared" of "[w]hat might happen if [he] t[old] the truth." Accordingly, he told the police that he did not know what had happened. He was released and picked up again after the Defendant turned himself in. He again lied to the police but stated that the "third statement [he] made was the truth." He explained the delay: "Because I ain't never been through nothing like that before; and after I seen what happened, I was afraid." He stated that he was no longer afraid. He also stated that he had not been promised anything.

On cross-examination, Lee admitted initially telling the police that he was not at the scene of the first robbery. In his second statement, he lied again and told the police that the Defendant had held the gun on the robbery victim. Lee testified that it was McDade who held the gun. He also testified that Barton was the person who first jumped out of his car and got into the Cadillac. He lied about this to the police, telling them that it was the Defendant who first drove the Cadillac.

Lee denied that he had grabbed the "Mexican." About the actual shooting, he testified that the victim "got hit with the gun, and it went off." He stated that the shooting was not planned to his knowledge. He acknowledged that he had been charged with facilitation of first degree murder while his co-defendants had been charged with first degree murder.

On redirect, Lee explained that he gave the police three statements pertaining to the shooting and one statement pertaining to the robbery of Stack. These statements were admitted into evidence.

Santiago Sanchez testified that his brother was Hosea Sanchez. At the time Hosea Sanchez died, he was twenty-eight years old and Santiago[3] was twenty years old. The two of them had lived together in an upstairs apartment at Prescott Place Apartments. On the night of December 22, 2008, at about 11:35 p.m., Santiago was in the apartment and heard shots outside. He looked out the window and saw his brother lying on the sidewalk in front of the steps. He also saw another person standing over his brother and then running away. He went downstairs and found his brother shot in the head. The other person was gone. He clarified that he heard one gunshot.

Santiago called the police. He stated that there did not appear to be anything missing from his brother's person. He also stated that, in addition to the gunshot wound, his brother "had kind of like a wound right here like somebody had hit him with a pistol."

Officer Lewis Seals of the MPD was the first officer to arrive in response to the shooting at Prescott Place Apartments. As he was surveying the scene, he noticed "what appeared to be a Highpoint handgun on the pavement near a vehicle." He cleared the area near the gun and left it in place. It was approximately eight to twelve feet from the victim. Emergency medical personnel arrived and pronounced the victim dead at the scene. Officer Seals remained on the scene and witnessed one of the crime-scene officers find "what appeared to be a bullet casing."

Robert Sutton testified that he knew the Defendant through his (Sutton's) brother, Keith Sutton. Robert[4] explained that the Defendant and Keith had known each other "a long time." Over the Defendant's objection, Robert clarified that the Defendant's relationship with Keith had been sexual. On the night in question, Robert got a phone call from the Defendant. The Defendant asked to speak with Keith, and Robert told him that Keith was asleep. The Defendant told Robert to tell Keith that he, the Defendant, "made a mistake." When Robert inquired further, the Defendant told him that he had shot someone but did not know if the victim was dead. The Defendant also told Robert that he had dropped the gun and had not been able to find it. After the phone call, Robert turned on the news on television and learned that the victim was dead. Robert informed the Defendant the next day about the death. Also on that day, Robert saw McDade with "the black phone – the touchscreen phone."

---

[3] Because the witness and the victim share a last name, we refer to the witness by his first name to avoid confusion. We intend no disrespect.

[4] Because the witness and his brother share a last name, we refer to them by their first names to avoid confusion. We intend no disrespect.

Robert stated that he advised the Defendant to turn himself in "[b]ecause it was a mistake – it was an accidental murder." Robert testified that the Defendant had explained the shooting as follows: "He said it was an accident. He said when he pulled the gun on dude, the Mexican went to snatch back, and . . . the gun went off, and he dropped – he panicked and dropped the gun."

Robert testified that the Defendant also told him about "[t]he robbery of the doctor downtown." He understood from their conversation that "all of them was together" but that McDade "was the one supposed to have robbed dude downtown." He also understood that McDade had been the gunman in that robbery. Robert testified that, to his understanding from the conversation, both crimes occurred on the same night: "it was like they robbed the guy downtown; then they went over there to the apartment and did that." He also understood that there had been two cars involved, one belonging to one of the participants and one of them "stolen from a guy downtown."

Robert testified that the Defendant told him that the shooting had taken place at Prescott Place Apartments. Robert explained that he (Robert) was familiar with the apartments because his family used to live there. He also stated that he knew the Defendant previously had visited an area nearby.

Lieutenant Walter Davidson of the MPD testified that he was the case officer over the homicide of Sanchez. He responded to the scene and saw the gun lying on the ground. He described the gun as "a black semi-automatic handgun." He left the gun where it was for later recovery by the crime-scene unit. A spent shell casing also was found at the scene. A couple of days later, he and Sergeant Rosario, who spoke Spanish, returned to the Prescott Place Apartments in an attempt to locate witnesses. They spoke with a male resident who informed them that he had had a cell phone taken from him. Follow-up investigation of the phone number indicated that the phone had been used by Robert Sutton. When Lt. Davidson spoke with Robert about the phone, Robert referred to the Defendant. This was the first report linking the Defendant to the crimes at issue.

Sergeant Joe Stark of the MPD testified that he assisted in the investigation of the Sanchez homicide. He reported to the scene and observed the collection and photography of evidence. He watched as another officer picked up the handgun and took the clip out. He stated that the clip had four live rounds, and the gun also had another live round in the chamber. He also observed the recovery of the spent shell casing, which he described as a nine-millimeter Winchester.

In the course of the investigation, they located Robert Sutton. Robert came into the police station voluntarily and spoke with Sgt. Stark. Keith Sutton also came in and spoke

-8-

with other officers. As a result of these conversations, the police began trying to locate four individuals: the Defendant, Leandres Lee, Barry McDade, and a person known as "Twin." Lee came in voluntarily two days later to "clear his name because he knew the police were looking for him." Lee gave a statement and was released because they "didn't have enough to hold him." The next day, the Defendant and McDade were taken into custody. Later that day, Lee was brought back in "[b]ecause things weren't adding up – what he told us." Through the Defendant and McDade, they learned Twin's identity (Joe Barton) and picked him up later that night.

Sgt. Stark took a statement from the Defendant after advising him of his rights. Sgt. Stark told the Defendant that they were "interested in the homicide of the Hispanic person over in the Prescott Place Apartments." According to Sgt. Stark, "right off the bat, he told us that it was an accident; that he was the one that shot him." Sgt. Stark identified the Defendant as "he." Sgt. Stark spoke with the Defendant for about an hour and obtained a written statement. The written statement was admitted into evidence and includes the following colloquy:

Q:     Are you aware that the Memphis Police Department is investigating the death of Jose Mejia that occurred on December 22, 2008 at 1751 Moryle Place?

A:     Yes Sir.

Q:     Are you the person responsible for the death of [the victim]?

A:     Yes Sir.

Q:     Do you know [the victim]?

A:     No Sir.

Q:     Describe in detail what occurred before, during and after the shooting of [the victim] on December 22, 2008.

A:     Me and [Lee, Barton and McDade] pulled up at Prescott Apartments planning on robbing, so we went and the first person we saw we suppose to get but I got a feeling in my gut telling me not to. So we went to the next person that was going up the steps and [Lee] run to him and grabbed him by the arm and pulled him down at gun point. I was about to pull the gun, [McDade] stopped me and it went off. The

gun slid under the car somewhere, I couldn't find it. I was there looking for the gun for like 3 minutes but couldn't find it. When the police showed up we fled the scene.

The Defendant said that two vehicles were used to get to the apartments, Lee's grandmother's car and a "black Cadillac" driven by Barton. The Defendant described the gun that he had as a black nine millimeter. He said that the gun belonged to a man named "Roberts," but he did not know "if his last name was Wynn or Sutton." The Defendant stated that it was Lee's idea to go to the Prescott Place Apartments.

Sgt. Stark testified that he also participated in taking statements from Lee, McDade, and Barton, also known as "Twin."

On cross-examination, Sgt. Stark acknowledged that he observed the homicide victim in the back of the ambulance at the crime scene and noted that he was still wearing his wristwatch; his wallet was in one of his pockets; and his pockets had not been turned inside out.

Tennessee Bureau of Investigation ("TBI") Special Agent Steve Scott testified that he is a forensic scientist "assigned to the firearms identification section of the crime lab." He examined the handgun collected at the homicide scene and testified that it was "in operating condition" and that "[t]he safety features do function as they are intended by the manufacturer." He performed a "trigger pull test" on the gun and determined that it took "eight pounds of pressure to pull the trigger." He testified,

When I did my examination of the firearm, I found no reason to believe – or no evidence that the gun would accidentally discharge by some mechanical dysfunction in the gun or malfunction in the gun. The only way I could make the gun discharge was to pull the trigger.

He also determined that the spent cartridge case recovered from the homicide scene had been fired from the gun.

On cross-examination, Special Agent Scott described the trigger pull of the gun as "very normal."

Dr. Miguel Laboy, assistant medical examiner of the office of Shelby County Medical Examiner, performed an autopsy on Sanchez. During his initial exam, he noted several abrasions to the victim's face and head; contusions to the victim's left arm and hand; and an entrance gunshot wound "in the right occipital scalp in the back of the head." The "wound

-10-

track" "exited at the left temporal scalp." He recovered no bullets or fragments. Dr. Laboy described the gunshot wound as "a lethal injury."

Dr. Laboy described an abrasion on the right side of the victim's forehead as a "three-by-three-inch abrasion with contusion that is . . . a pattern shape." He added, "And explaining that, there's something that hit that area with that shape that's consistent with a corner of something." Dr. Laboy stated that the wound "was almost a rectangular shape."

Dr. Laboy testified that the cause of the victim's death was a gunshot wound to the head and that the manner of death was homicide.

Joey Barton testified that he had pled guilty to second degree murder for the death of a man at Prescott Apartments. He stated that he did not pull the trigger, that the Defendant did. He also pled guilty to attempted aggravated robbery, aggravated robbery, and theft of property over $10,000. He stated that the robbery occurred downtown in an alley and that the Defendant, McDade, and Lee were with him. He had a 380 handgun, and McDade had a nine millimeter. He acted as the lookout, and McDade was the gunman. He, Lee, and the Defendant did not go up to the victim. McDade got the victim's "[c]ar keys, I.D., and stuff." Barton denied that anyone patted the victim down. He stated that, prior to McDade approaching the victim, the Defendant said, "There go one." Barton admitted that he took the car keys obtained from the victim and found the car by hitting the alarm button. He then got in the car and drove off. McDade joined him shortly thereafter.

They drove around for a while, with Lee and the Defendant in the other car. Barton then parked the stolen car and joined Lee. The Defendant joined McDade in the stolen car, with McDade driving. Barton and Lee followed McDade and the Defendant to Prescott Place Apartments. Barton testified, "That's when [the Defendant] and [McDade] approached the dude trying to rob him." According to Barton, McDade had given his gun to the Defendant. Barton testified, "That's when [the Defendant] and [McDade] approached the dude, and he was like trying to go up the stairs. They pulled him down, and hit him across the head with the gun, and it went off." He clarified that the victim had been going up the stairs, and the Defendant and McDade grabbed the victim by his shirt. The Defendant then hit the victim "across the head with the gun." The gun went off, and Barton and Lee walked off. Barton and Lee got back in Lee's car, and he saw the Defendant and McDade go to the stolen car. Barton went to his sister's house. He did not call the police. He did not know how the stolen car arrived at the location where it was eventually recovered.

On cross-examination, Barton acknowledged that his nickname was "Twin." He reiterated that McDade was the leader in the robbery of Stack and that McDade was the gunman in that crime. He also reiterated that he, Lee, and the Defendant were not "right up"

on Stack. As to the homicide, he stated that he thought it was McDade's idea to go to Prescott Place Apartments. He also stated that the gun used to kill the victim was the gun that McDade originally had in his possession, a black nine millimeter. He testified that there had been no discussion about shooting anyone, that the gun fired when it was used to strike the victim in the head, and that the shooting was an accident. He acknowledged having pled guilty to a lesser offense than the first degree murder with which he originally was charged.

Barry McDade testified that the Defendant was his cousin. In September 2008, they were both living with their grandmother in Memphis. On the evening of December 22, 2008, Lee came by in his grandmother's car and picked up McDade and the Defendant. On their way downtown, they stopped and picked up Barton. When asked why the four of them were going downtown, McDade testified, "[t]o rob." He stated that there was no plan, that they were just going to look for someone. When they saw Stack, they "jumped out the car" and "ran up on him and robbed him – took his stuff – his belongings – and got back in the car." When they noticed that Stack's belongings included some car keys, they began looking for the car. When they found it, Barton "got out and got in the car and took off." McDade testified that the car was a new Cadillac.

McDade admitted that he held the gun on Stack during the robbery. Afterwards, the four men went to Lee's grandparents' house. They stayed about twenty minutes, and Lee said, "Come on, let's go rob some more." The others agreed, and McDade testified that he agreed to participate because he wanted some money. The four men drove over to Prescott Place Apartments, Lee driving his grandmother's car and the Defendant driving the Cadillac. McDade rode with the Defendant. According to McDade, the Defendant led the way.

When they reached the apartments, the Defendant parked on a dead-end side street. The four men walked through a hole in the fence "looking for somebody to rob." The first person they saw was a woman, and the Defendant said that he was not going to rob her. The next person they saw was the victim Sanchez, who was "about to walk up the stairs." McDade and the Defendant approached and, as Sanchez was on the third or fourth step, the Defendant "grabbed him by the shirt." McDade testified that he did not grab Sanchez but was standing at the bottom of the stairs. After the Defendant "snatched [Sanchez] down the steps," the Defendant hit Sanchez with a gun, "and it went off." The men began to run off, but the Defendant stopped McDade and told him "to go look for the gun." The Defendant told McDade that he had dropped the gun, and McDade began to return to the scene. He changed his mind, however, and resumed running away. He got in the Cadillac. The other three men got into Lee's grandmother's car. They drove to the Defendant's brother's house. McDade later learned from the news that Sanchez had died. McDade described the gun the Defendant used as "a black nine." He also stated that they did not get any property from Sanchez because they were "scared."

-12-

McDade admitted previously pleading guilty to second degree murder and attempted robbery for the crimes involving Sanchez, and to aggravated robbery and theft over $10,000 for the crimes involving Stack.

During cross-examination, McDade reiterated that he had held the black nine millimeter gun on Stack. He got this gun from a man he knew as Joe, whose brother was named Keith. He stated that they were not planning on hurting or shooting anyone. It was Lee's idea to rob someone at Prescott Place Apartments because he previously had robbed someone there.

The State rested after McDade's testimony. The Defendant presented no proof. The jury subsequently found the Defendant guilty of first degree felony murder; attempted aggravated robbery; aggravated robbery; and theft of property between $10,000 and $60,000. The trial court sentenced the Defendant to life in prison with the possibility of parole on the murder conviction. After a subsequent sentencing hearing, the trial court sentenced the Defendant as a Range I offender to five years for the attempted aggravated robbery of Sanchez, to be served consecutively to the life sentence; eight years for the aggravated robbery of Stack, to be served consecutively to the life sentence and the five-year sentence; and four years for the theft, to be served concurrently to the eight-year sentence; for an effective sentence of life plus thirteen years. The trial court denied the Defendant's motion for new trial.

In this direct appeal, the Defendant contends that the trial court erred by (1) admitting into evidence proof that the Defendant had been in a homosexual relationship; (2) prohibiting defense counsel from cross-examining Barton and McDade about their original sentence exposure; (3) instructing the jury that evidence of a confession had been admitted; (4) failing to instruct the jury as to certain lesser-included offenses; and (5) imposing consecutive sentences. The Defendant also challenges the sufficiency of the evidence as to all of his convictions.

## Analysis

*Nature of Defendant's Relationship*

During trial, and over the Defendant's objection, the State was permitted to question Robert Sutton about the nature of the relationship between his brother, Keith, and the Defendant. Robert testified that his brother and the Defendant had been lovers and even described them with a pejorative term. The Defendant contends that the trial court committed reversible error in permitting this proof to be adduced.

As our supreme court has explained,

> Decisions regarding the admission or exclusion of evidence are entrusted to the trial court's discretion. Thus, reviewing courts will not disturb these decisions on appeal unless the trial court has abused its discretion. Reviewing courts will find an abuse of discretion only when the trial court applied incorrect legal standards, reached an illogical conclusion, based its decision on a clearly erroneous assessment of the evidence, or employed reasoning that causes an injustice to the complaining party.

State v. Banks, 271 S.W.3d 90, 116 (Tenn. 2008) (citations omitted); see also State v. Brock, 327 S.W.3d 645, 691 (Tenn. Crim. App. 2009). Even when the trial court commits an abuse of discretion in making an evidentiary ruling, the defendant will not be entitled to relief unless the error "more probably than not affected the judgment or would result in prejudice to the judicial process." Tenn. R. App. P. 36(b); see also State v. Rodriguez, 254 S.W.3d 361, 375 (Tenn. 2008) (applying Tennessee Rule of Appellate Procedure 36(b) harmless error review to trial court's erroneous admission of evidence).

Evidence is not admissible unless it is relevant. Tenn. R. Evid. 402. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. The Defendant contends that evidence of the nature of his relationship with Keith Sutton was not relevant and should have been excluded. He also contends that the erroneous admission of this evidence "more probably than not affected the judgment," entitling him to a new trial. He further contends that "the trial court's allowing the State to inject such clearly irrelevant information into this murder trial did result in prejudice to the judicial process," also entitling him to a new trial.

The State responds that the evidence was relevant because it "served to establish [Robert Sutton's] credibility and to explain why the [D]efendant would confide in Robert about his criminal activities." The State also asserts that, even if the trial court erred in admitting this evidence, any error was harmless.

We agree with the Defendant that the trial court erred in allowing the State to introduce proof that the Defendant had been involved in a homosexual relationship. Although witness credibility is always a relevant issue, see United States v. Green, 617 F.3d 233, 251 (3rd Cir. 2010), State v. Darrell Wayne Syler, No. E2003-02626-CCA-R3-CD, 2004 WL 2039809, at *2 (Tenn. Crim. App. Sept. 13, 2004), we are not persuaded that, under the facts and circumstances of this case, the sexual nature of the Defendant's relationship with Keith Sutton was information relevant to establishing Robert Sutton's credibility.

-14-

At trial, the State asked Robert Sutton how long he had known the Defendant. Robert replied, "I ain't known him too long. I met him through my brother." When asked how long the Defendant had known his brother, Robert replied, "They've been knowing each other for a long time." The State then asked, "what was their relationship?" Upon the Defendant's objection, the State argued that the objection would have no basis if the relationship were a heterosexual one, that "nobody would say anything." The defense persisted in its argument that the nature of the relationship was not relevant, and the trial court responded, "Well, I mean it shows how good a relationship they had." The State added, "And it also shows anything – I mean, he's close with his brother. This is not somebody that he didn't like. This is his brother's friend and partner at one time. He had nothing against [the Defendant] so he's out to get him." The trial court stated, "I see. I agree. I agree." The prosecutor then elicited testimony about the Defendant's homosexual relationship with Keith Sutton.

We disagree with the State's argument that Robert's credibility was bolstered by his knowledge about the nature of the Defendant's relationship with Keith. This case does not involve sexual crimes. Nor is there any proof in the record that any sexual motivation played a part in the Defendant's actions against either victim. Robert Sutton's relationship to the Defendant via Keith Sutton could have been established without reference to any sexual activities that may have occurred. We hold that the trial court erred in allowing the State to elicit testimony about the Defendant's homosexual relationship with Keith Sutton.

Nevertheless, we also hold that the erroneous admission of this evidence was harmless error. In this direct appeal, the Defendant bears the burden of demonstrating that the trial court's error "more probably than not affected the judgment or would result in prejudice to the judicial process." Tenn. R. Crim. P. 36(b); see Rodriguez, 254 S.W.3d at 372. In our assessment, we consider the entire record, including "the properly admitted evidence of the defendant's guilt." Rodriguez, 254 S.W.3d at 372. "The greater the amount of evidence of guilt, the heavier the burden on the defendant to demonstrate that [the erroneous admission of evidence] more probably than not affected the outcome of the trial." Id. Nevertheless,

> [w]hen an appellate court undertakes a harmless error analysis its purpose is to ascertain the actual basis for the jury's verdict. An inquiry into harmless error does not turn upon the existence of sufficient evidence to affirm a conviction or even a belief that the jury's verdict is correct. To the contrary, the crucial consideration is what impact the error may reasonably be taken to have had on the jury's decision-making. Where an error more probably than not had a substantial and injurious impact on the jury's decision-making, it is not harmless.

Id. (citations omitted).

In this case, the evidence of the Defendant's guilt is overwhelming. The Defendant admitted his active participation as the lookout in the aggravated robbery of Stack. He admitted his assistance in locating Stack's car, of which one of his co-defendants subsequently took possession. The Defendant admitted intending to rob Sanchez and actively pursuing that goal while armed with a loaded gun. The Defendant also admitted that his gun killed Sanchez during the robbery attempt. The Defendant's cohorts testified against the Defendant, implicating him in the crimes against Stack and the crimes against Sanchez. In contrast, proof of the Defendant's homosexual relationship with Keith Sutton was brief and limited to one witness' testimony. The Defendant's alleged homosexual relationship did not consist of propensity evidence because the crimes at issue had no sexual component. Cf. Rodriguez, 254 S.W.3d at 375-78 (in trial on two counts of child rape and two counts of aggravated sexual battery, trial court committed reversible error in admitting propensity evidence suggesting that defendant possessed child pornography). We hold that, considering the record as a whole, the Defendant has failed to demonstrate that the erroneously admitted testimony had any impact on the jury's verdicts or had a prejudicial impact on the judicial process. Accordingly, the Defendant has failed to demonstrate that he is entitled to relief on this basis.

*Limitation on Cross-Examination*

The Defendant contends that the trial court committed plain error in not permitting him to cross-examine Barton and McDade to establish that, prior to their guilty pleas to second degree murder, they each faced the possibility of life in prison on the original charge of first degree felony murder. The Defendant argues that "[p]robing into the exact number of years is critical to establish the witness's bias" and that the trial court's ruling violated his constitutional rights to confrontation.

This Court will grant relief for plain error only when five prerequisites are satisfied:

(1) the record clearly establishes what occurred in the trial court, (2) a clear and unequivocal rule of law was breached, (3) a substantial right of the accused was adversely affected, (4) the accused did not waive the issue for tactical reasons, and (5) consideration of the error is necessary to do substantial justice.

Banks, 271 S.W.3d at 119-20; see also State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994). The Defendant bears the burden of demonstrating plain error, and this Court need not consider all five factors "when it is clear from the record that at least one of them cannot be satisfied." State v. Bledsoe, 226 S.W.3d 349, 355 (Tenn. 2007).

Turning to the first plain error factor, the record reveals that, under cross-examination, Barton testified that he had pled guilty to second degree murder as to the victim Sanchez, with a sentence of fifteen years, and to robbery as to the victim Stack, with a consecutive sentence of eight years, for an effective sentence of twenty-three years. Defense counsel then asked, "So, instead of facing up to seventy-five years, you – " at which point the State objected. The trial court sustained the objection. On redirect, the State clarified that Barton had pled guilty to aggravated robbery as to Stack, as well as to theft of property over $10,000. He also pled guilty to attempted aggravated robbery as to Sanchez. The State asked, "The deal, as [defense counsel] wants to call it, that you got is that you got to plead to murder two instead of murder one, right?" Barton answered affirmatively.

McDade also testified that he pled guilty to second degree murder and attempted aggravated robbery as to Sanchez and to aggravated robbery and theft of property over $10,000 as to Stack, and that he received an effective sentence of twenty-three years. On cross-examination, the defense established that McDade pled guilty to a "reduced charge" and that he was "not facing as much time." The defense also asked, "And, in fact, you got the minimum for every charge you pled to, isn't that right?" to which McDade replied, "I don't know." McDade admitted that some of his sentences were "run together."

We now turn to the second plain error factor, whether the trial court's ruling – that the defense could not inquire about the sentence exposure that Barton and McDade originally faced on their first degree murder charges – breached a clear and unequivocal rule of law. The Defendant contends that the trial court's ruling violated his constitutional rights to confront the witnesses against him.

The confrontation clauses of the federal and state constitutions[5] guarantee criminal defendants the right to question a witness about possible bias, including inquiries about "any promises of leniency, promises to help the witness, or any other favorable treatment offered to the witness." State v. Sayles, 49 S.W.3d 275, 279 (Tenn. 2001). This right is not limitless, however, and only an undue restriction of this right violates the confrontation clauses of the federal and Tennessee constitutions. See id.; see also Delaware v. Van Arsdall, 475 U.S. 673, 678-79 (1986); State v. Rice, 184 S.W.3d 646, 670 (Tenn. 2006). As our supreme court has explained,

> "[A] criminal defendant states a violation of the [federal] Confrontation Clause
> by showing that he was prohibited from engaging in *otherwise appropriate*
> cross-examination designed to show a prototypical form of bias on the part of

---

[5] See U.S. Const. Amend. VI; Tenn. Const. art. I, § 9.

the witness, thereby exposing to the jury the facts from which jurors could appropriately draw inferences relating to the reliability of the witnesses."

State v. Black, 815 S.W.2d 166, 177 (Tenn. 1991) (quoting Van Arsdall, 475 U.S. at 680) (emphasis added). We review limitations placed by the trial court on cross-examination for an abuse of discretion. See Sayles, 49 S.W.3d at 279.

Because Barton and McDade pled guilty to the lesser offense of second degree murder on the original first degree murder charge, their fifteen year sentences for that crime did not reflect their original exposure to life imprisonment and, thus, did not allow the jury to evaluate precisely the extent of the benefit they received by pleading guilty and testifying against the Defendant. Nevertheless, we hold that, under the facts and circumstances of this case, the trial court did not abuse its discretion in prohibiting the defense from cross-examining Barton and McDade about their total sentence exposure prior to pleading guilty. First, because Barton and McDade originally were charged with first degree felony murder, eliciting the penalties they faced on that charge simultaneously would have informed the jury about the penalties the Defendant also faced.

Tennessee Code Annotated section 40-35-201(b) provides that,

[i]n all contested criminal cases, except for capital crimes that are governed by the procedures contained in §§ 39-13-204 and 39-13-205, and as necessary to comply with the Constitution of Tennessee, article VI, § 14, and § 40-35-301, the judge shall not instruct the jury, nor shall the attorneys be permitted to comment at any time to the jury, on possible penalties for the offense charged nor all lesser included offenses.

Tenn. Code Ann. § 40-35-201(b) (2006, 2010). Thus, allowing this line of cross-examination would have resulted in the jury being informed of the precise information that this statute prohibits. The Defendant has cited us to no authority for the proposition that this statute is unconstitutional when applied to limit the cross-examination of co-defendants charged with crimes identical to the defendant on trial.

Second, the trial court allowed sufficient cross-examination to inform the jury that Barton and McDade pled guilty to a lesser offense than first degree murder and, accordingly, received a lower sentence. This information allowed the jury to discount Barton's and McDade's testimony as it deemed appropriate. This Court previously has held that a trial court does not abuse its discretion in preventing a defendant from examining a witness about "the exact range of potential sentences [the witness] faced" because such information is "not necessary to uncover any bias and would add only marginally to the jury's understanding of

-18-

[the witness'] credibility." State v. Alejandro Chevo Guana, No. W2008-01304-CCA-R3-CD, 2010 WL 2593631, at *8 (Tenn. Crim. App. Jun 29, 2010), perm. appeal denied (Tenn. Nov. 18, 2010); see also State v. Stacy Lee Fleming, No. W2009-02192-CCA-R3CD, 2011 WL 1135760, at *7 (Tenn. Crim. App. Mar. 38, 2011) (trial court did not violate defendant's confrontation right by "refus[ing] to allow defense counsel to ask about the maximum sentence for [the witness'] convictions, based on the potential for consecutive sentencing" when trial court permitted questions about whether witness received a favorable sentence), perm. app. denied (Tenn. July 14, 2011). Accordingly, the trial court did not abuse its discretion in limiting these cross-examinations. Therefore, the trial court did not breach a clear and unequivocal rule of law in prohibiting the defense from questioning Barton and McDade about the sentence ranges applicable to the crimes for which they were indicted. Accordingly, the Defendant is not entitled to plain error relief on this basis.

*Jury Instruction on Confession*

The trial court instructed the jury as follows:

Confession. Evidence of a confession has been introduced in the case. A confession is a statement by the defendant that he engaged in conduct which constitutes the crime charged and is an acknowledgment of guilt itself. The court has ruled that the confession is admissible in evidence, but it is your duty to judge its truth. In so judging, you should consider the circumstances under which a confession was obtained as well as any evidence which contradicts all or part of the statements made. You must consider all of the statements made by the defendant whether favorable or unfavorable to him; and you must not disregard any of them without good reason.

If the evidence in this case tends – excuse me. If the evidence in this case leads you to believe that the confession or any part of it is untrue or was never made, you should disregard it or that portion which you do not believe.

You are the sole judge of what weight should be given to those portions of the confession which you believe, and you should consider them along with all other evidence in the case in determining the defendant's guilt or innocence.

The Defendant contends that, in so charging the jury, the trial court committed plain error because his statements to the police were nothing more than admissions. The State disagrees.

The elements of plain error review are set forth above. As explained many years ago by the Tennessee Supreme Court,

> The distinction between an admission and a confession is blurred. Generally, however, "a 'confession' is a statement by the accused that he engaged in conduct which constitutes a crime. . . . An admission is an acknowledgment by the accused of certain facts which tend together with other facts, to establish his guilt; while a confession is an acknowledgment of guilt itself. An admission, then, is something less than a confession and, unlike a confession, . . . an admission is not sufficient in itself to support a conviction."

Helton v. State, 547 S.W.2d 564, 567 (Tenn. 1977) (quoting 3 Wharton's Criminal Evidence (13th ed. Torcia 1973), §§ 662 and 663), overruled on other grounds by State v. Cabbage, 571 S.W.2d 832 (Tenn. 1978). When a defendant admits in a statement to having engaged in each element of the crime with which he or she is charged, the statement properly is characterized as a confession. See State v. Lee, 631 S.W.2d 453, 455 (Tenn. Crim. App. 1982). The Defendant contends that his "statements to police can properly be categorized as confessions to *facilitation* of the charged offenses," and, as such, were improperly characterized by the trial court as confessions to the crimes charged.

We disagree. We first address the aggravated robbery and theft involving victim Stack. Aggravated robbery is defined as the intentional or knowing theft of property from the person of another by violence or putting the person in fear, accomplished with a deadly weapon. See Tenn. Code Ann. §§ 39-13-401(a), -402(a)(1) (2006). Theft is defined as knowingly obtaining or exercising control over property without the owner's effective consent and with the intent to deprive the owner of the property. See id. § 39-14-103 (2006). A person is criminally responsible for crimes committed by another when, "[a]cting with intent to promote or assist the commission of the offense, *or* to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense." Tenn. Code Ann. § 39-11-402(2) (2006) (emphasis added). Our supreme court has explained that "[t]he justification for this theory of criminal liability is that, in addition to the primary criminal actor, aiders and abettors should be held accountable for the criminal harms they intentionally facilitated or helped set in motion." State v. Sherman, 266 S.W.3d 395, 408 (Tenn. 2008). While a person's mere presence during the commission of a crime is not sufficient to confer criminal liability, it is not necessary that he or she take physical part in the crime. Rather, encouragement of the principal actor will suffice. Id. A defendant convicted under a theory of criminal responsibility for the conduct of another is considered a principal offender to the same extent as if he had committed the offense himself. See State v. Hatcher, 310 S.W.3d 788, 811 (Tenn. 2010).

When asked by the police if he participated "in the robbery of Michael Stack, which occurred at 1 N. Main on December 22, 2008 at approximately 8:00 p.m.," the Defendant responded, "Yes sir, as the lookout." The Defendant also stated that, after his cohorts collected Stack's property, they all returned to their car and drove off. The Defendant "told them let me see the keys that they had" and, after he looked at them, told them the year of the car. The Defendant's actions constituted active participation in finding and taking the car. Acting as a lookout during the commission of a robbery and helping to locate the victim's property in order to take it constitute active assistance in the commission of the crimes. Such conduct is sufficient to convict the accused of the crimes committed by a cohort under the theory of criminal responsibility. See, e.g., State v. Eric Sims, No. W2011-00678-CCA-R3-CD, 2012 WL 1096097, at *5-6 (Tenn. Crim. App. Mar. 30, 2012) (evidence sufficient to support defendant's aggravated robbery conviction where defendant acted as lookout and obtained two dollars from the robbery), perm. app. denied (Tenn. Aug. 15, 2012); State v. James Arthur Johnson, No. M2009-01147-CCA-R3-CD, 2010 WL 3323796, at *4 (Tenn. Crim. App. Aug. 24, 2010) (evidence sufficient to support defendant's aggravated robbery conviction where defendant admitted he was aware co-defendant had a gun and planned to rob victims, and defendant acted as lookout and admitted he hoped to be paid for doing so), perm. app. denied, (Tenn. Jan. 13, 2011). Accordingly, the trial court properly characterized the Defendant's statement as a confession as to the aggravated robbery of Stack and to the theft of property from Stack.

As to the crimes committed against Sanchez, the Defendant was charged with first degree felony murder committed in the attempt to commit an aggravated robbery. He told the police that he was the person responsible for the victim's death and that he had a "9mm black gun." The Defendant also stated to the police the following:

> Me and [Lee, Barton and McDade] pulled up at Prescott Apartments planning on robbing, so we went and the first person we saw we suppose to get but I got a feeling in my gut telling me not to. So we went to the next person that was going up the steps and [Lee] run to him and grabbed him by the arm and pulled him down at gun point. I was about to pull the gun, [McDade] stopped me and it went off.

Thus, the Defendant stated that he was planning on robbing someone; that he was armed; that he accosted the second potential victim he saw; and that the gun discharged during the attempted robbery, killing the victim. These statements constitute admissions to each element of the offense of first degree felony murder during the attempt to commit an aggravated robbery. See Tenn. Code Ann. § 39-13-202(a)(2) (Supp. 2008) (defining first degree felony murder as "[a] killing of another committed in the . . . attempt to perpetrate any . . . robbery"). These statements also constitute admissions to each element of the offense

-21-

of attempt to commit aggravated robbery. The elements of aggravated robbery are set forth above. A person commits an attempt to commit an aggravated robbery when he or she engages in conduct with the intent to commit an aggravated robbery and the conduct "constitutes a substantial step toward the commission of" the aggravated robbery. Tenn. Code Ann. § 39-12-101(a)(3) (2006). The Defendant stated that he armed himself with the intent to commit a robbery and that he accosted Sanchez in that endeavor. These statements constitute an admission to each element of the offense of attempted aggravated robbery. Accordingly, the trial court committed no error in characterizing the Defendant's statements as a confession to both of these offenses, and, therefore, committed no breach of a clear and unequivocal rule of law in its charge to the jury. The Defendant is not entitled to plain error relief on this basis.

*Failure to Charge Facilitation of Offenses*

The Defendant next contends that the trial court committed reversible error in refusing to instruct the jury on the lesser-included offenses of facilitation of the attempted aggravated robbery of Sanchez; facilitation of the felony murder of Sanchez; and facilitation of the theft of property over $10,000 from Stack.[6] The State disagrees.

Facilitation of a felony is generally a lesser-included offense of the charged offense when the defendant is accused under the theory of criminal responsibility for the conduct of another. See State v. Fowler, 23 S.W.3d 285, 288 (Tenn. 2000); State v. Burns, 6 S.W.3d 453, 466-67, 470 (Tenn. 1999). As indicated above, a defendant may be criminally responsible as a party to an offense "if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." Tenn. Code Ann. § 39-11-401(a) (2006). When the offense is actually committed "by the conduct of another," the defendant nevertheless is criminally responsible as a principal if, "[a]cting with intent to promote or assist in the commission of the offense, or to benefit in the proceeds or results of the offense, the [defendant] solicits, directs, aids, or attempts to aid another person to commit the offense[.]" Id. § 39-11-402(2). In contrast, the lesser-included offense of facilitation of a felony is committed where the defendant, "knowing that another intends to commit a specific felony, *but without the intent for criminal responsibility under § 39-11-402(2)*, the [defendant] knowingly furnishes substantial assistance in the commission of the felony." Id. § 39-11-403(a) (2006) (emphasis added).

Although our supreme court has declared that "[a]n offense is a lesser-included offense if . . . it consists of . . . facilitation of the offense charged," Burns, 6 S.W.3d at 466-

---

[6] The trial court charged the jury on facilitation of the aggravated robbery of Stack.

67, a trial judge is not required to charge a particular lesser-included offense to the jury unless two prerequisites are met:

> First, the trial court must determine whether any evidence exists that reasonable minds could accept as to the lesser-included offense. In making this determination, the trial court must view the evidence liberally in the light most favorable to the existence of the lesser-included offense without making any judgments on the credibility of such evidence. Second, the trial court must determine if the evidence, viewed in this light, is legally sufficient to support a conviction for the lesser-included offense.

Id. at 469. The trial court's duty to instruct the jury on lesser-included offenses depends upon the evidence adduced at trial, not upon the theory of the State or the defense. State v. Robinson, 146 S.W.3d 469, 486 (Tenn. 2004). As to the specific lesser-included offense of facilitation, our supreme court has recognized that the trial court need not charge the jury on facilitation when "no reasonable jury could have concluded from the evidence presented that the defendant had the knowledge required for facilitation but lacked the intent required for criminal responsibility." Id. at 488.

<u>Facilitation of Attempted Aggravated Robbery of Sanchez</u>

In this case, the trial court refused the Defendant's request to charge the jury on the lesser-included offense of facilitation of the attempted aggravated robbery of Sanchez, stating, "I believe that criminal-attempt robbery would be the only lesser-included that a rational trier of fact could come back with other than not guilty." In reviewing the proof, the trial court focused on the Defendant's statement, noting that, at best, the jury could have concluded that the Defendant, after arming himself and intending to commit a robbery, could have changed his mind about committing the robbery. Such a construction of the evidence would have entitled the jury to return a verdict of not guilty on the charge of attempted aggravated robbery. We agree with the trial court, however, that there is no proof in the record supporting the inference that the Defendant did not intend to commit a robbery or did not intend to assist Lee and/or McDade commit a robbery, but merely furnished substantial assistance to his co-defendant(s) in their attempt to commit an aggravated robbery without such intent. The Defendant told the police that he and his cohorts went to the Prescott Place Apartments "planning on robbing." In pursuit of this specific intention, the Defendant assessed the first potential victim and decided not to rob that particular person. When the next potential victim appeared, the Defendant, by his own statement, began actively pursuing an armed robbery. During the course of the Defendant's active pursuit, he was assisted by Lee and/or McDade. The Defendant drew his gun and, during the attempted robbery of the victim by the Defendant and Lee and/or McDade, the Defendant's gun discharged. Nothing

about this course of events, as described by the Defendant himself, supports the inference that the Defendant was merely facilitating his co-defendant(s) in the attempted robbery of Sanchez. Nor does any other proof in the record support such an inference. The trial court committed no error in refusing to charge the jury with the lesser-included offense of facilitation of the attempted aggravated robbery of Sanchez. The Defendant is entitled to no relief on this basis.

<u>Facilitation of Felony Murder of Sanchez</u>

For similar reasons, the trial court refused to charge the jury on the lesser-included offense of facilitation of the first degree felony murder of Sanchez. We hold that the trial court's ruling was not error. Felony murder requires only the intent to commit the underlying felony. <u>See</u> Tenn. Code Ann. § 39-13-202(b); <u>Banks</u>, 271 S.W.3d at 139-40. In this case, the underlying felony was attempted aggravated robbery. As set forth above, the Defendant admitted that he intended to rob Sanchez. During the Defendant's attempt to do so, his gun fired and killed Sanchez. That the gun's discharge may have been entirely accidental is irrelevant. <u>See</u> <u>State v. Kimbrough</u>, 924 S.W.2d 888, 890 (Tenn. 1996) (recognizing that "[f]elony-murder differs from other forms of murder because it holds the actor strictly accountable [for the victim's death] even where the killing is unintended") (citing 2 Charles E. Torcia, <u>Wharton's Criminal Law</u> § 147 at 300-01 (15th ed. 1994)). There is no proof in the record that the Defendant intended merely to facilitate Lee and/or McDade's attempt to rob Sanchez. Accordingly, the Defendant was not entitled to a jury instruction on the offense of facilitation of felony murder. The Defendant is entitled to no relief on this basis.

<u>Facilitation of Theft from Stack</u>

The Defendant also contends that the trial court should have charged the jury on facilitation of theft of property valued between $10,000 and $60,000 as to the theft from Stack. The trial court refused to give this instruction, explaining

[The Defendant] was in possession of the car. He had – in my opinion, no rational trier of fact could say he did not have the desire to gain from the proceeds – or receive some of the proceeds from that. So, I'm just going to go with theft of property and all the lessers all the way down to $500 if that's what they want to believe.

The Defendant argues that the trial court erred because the only proof that the Defendant was ever in the stolen Cadillac came from his co-defendants. According to the Defendant's statements to the police, the only "contact" he had with the Cadillac was to examine the keys after they were taken from Stack and identify the car they belonged to as "an '09."

-24-

Moreover, although the Defendant admitted to being the lookout in the aggravated robbery of Stack, he did not admit to any further participation and denied having received any of the items taken from Stack.

The Defendant's statements to the police reasonably could lead to the conclusion that the Defendant merely facilitated the theft of the Cadillac. Indeed, the trial court charged the jury with facilitation of the aggravated robbery of Stack. Just as the jury reasonably could have chosen to believe that the Defendant merely facilitated the aggravated robbery of Stack, if the jury chose to believe the Defendant's statement over those of his cohorts, a verdict of facilitation of theft of property over $10,000 would be supported by the evidence. Accordingly, we hold that the trial court erred in refusing to instruct the jury on facilitation of the theft of property between $10,000 and $60,000.

A trial court's erroneous failure to charge an appropriate lesser-included offense requires a new trial on the indicted offense unless the State demonstrates that the trial court's error was harmless beyond a reasonable doubt. See State v. Brown, 311 S.W.3d 422, 434 (Tenn. 2010). Here, the State has failed to establish that the trial court's error was harmless beyond a reasonable doubt. Based on our review of the entire record, the jury should have been given the opportunity to accept the Defendant's version of events and reject that of his co-defendants. According to the Defendant, his participation in the theft of the Cadillac was limited to examining the keys and informing his cohorts that the keys belonged to a 2009 vehicle. The jury should have been given the opportunity to determine that the Defendant examined the keys while knowing that his cohorts would then locate and steal the car, but without the intent to assist them in that endeavor or to benefit from the theft of the car. The jury was not given this opportunity. In light of the Defendant's version of events, we are unable to conclude beyond a reasonable doubt that the jury, if given the opportunity, would not have convicted the Defendant of facilitation of the theft of Stack's car. See State v. Wilson, 92 S.W.3d 391, 395-96 (Tenn. 2002) (where jury convicted defendant of second degree murder on charge of first degree murder, trial court committed reversible error in failing to charge jury on lesser-included offenses of reckless homicide and criminally negligent homicide because jury "was not instructed as to any offense containing a mental state less culpable than knowing"). Accordingly, we are constrained to hold that the trial court's error was not harmless. Therefore, we must reverse the Defendant's conviction of theft of property between $10,000 and $60,000 and remand this matter for a new trial on that charge.

*Sufficiency of the Evidence*

The Defendant contends that the evidence is not sufficient to support any of his convictions. Our standard of review regarding sufficiency of the evidence is "whether, after

viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e). After a jury finds a defendant guilty, the presumption of innocence is removed and replaced with a presumption of guilt. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Consequently, the defendant has the burden on appeal of demonstrating why the evidence was insufficient to support the jury's verdict. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellate court does not weigh the evidence anew; rather, "a jury verdict, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts" in the testimony and all reasonably drawn inferences in favor of the State. State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, "the State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom." Id. (citation omitted).

This standard of review applies to guilty verdicts based upon direct or circumstantial evidence. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (citing State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). In Dorantes, our Supreme Court adopted the United States Supreme Court standard that "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." Id. at 381. Accordingly, the evidence need not exclude every other reasonable hypothesis except that of the defendant's guilt, provided the defendant's guilt is established beyond a reasonable doubt. Id.

Convictions may not be based solely on a defendant's confession, "and, therefore, . . . the State must present some corroborating evidence to establish the corpus delecti," which is the "'body of the crime – evidence that a crime was committed at the place alleged in the indictment.'" Banks, 271 S.W.3d at 140 (quoting Van Zandt v. State, 402 S.W.2d 130, 136 (Tenn. 1966)). Even slight corroborating evidence is sufficient and may consist of circumstantial proof. Id. "Thus, '[a] confession may sustain a conviction where there is other evidence sufficient to show the commission of the crime by someone.'" Id. (quoting State v. Jones, 15 S.W.3d 880, 891 (Tenn. Crim. App. 1999)).

Also, a defendant may not be convicted solely on an accomplice's uncorroborated testimony. Rather,

> there must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a

conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's evidence. The corroboration need not be conclusive, but it is sufficient if this evidence, of itself, tends to connect the defendant with the commission of the offense, although the evidence is slight and entitled, when standing alone, to but little consideration.

State v. Bigbee, 885 S.W.2d 797, 803 (Tenn. 1994) (quoting State v. Gaylor, 862 S.W.2d 546, 552 (Tenn. Crim. App. 1992)), superseded by statute on other grounds as stated in State v. Odom, 137 S.W.3d 572, 580-81 (Tenn. 2004).

We turn now to each of the crimes upon which the jury convicted the Defendant.

First Degree Felony Murder of Sanchez

As charged in this case, first degree felony murder is defined as "[a] killing of another committed in the . . . attempt to perpetrate any . . . robbery." Tenn. Code Ann. § 39-13-202(a)(2). Significantly, "[n]o culpable mental state is required" for a conviction of first degree felony murder, "except the intent to commit the [robbery]." Id. § 39-13-202(b).

As set forth above, the Defendant admitted that he shot and killed Sanchez during an attempted robbery. His co-defendants also testified that the Defendant shot and killed Sanchez while the Defendant was attempting to rob him. The Defendant told the police that he dropped a nine millimeter handgun at the scene, and the police later recovered such a gun at the scene. The State proved that Sanchez died from a single gunshot wound to the head. This proof is more than sufficient to support the Defendant's conviction. The Defendant is entitled to no relief on this basis.

Attempted Aggravated Robbery of Sanchez

Aggravated robbery as charged in this case is defined as a robbery "[a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon." Tenn. Code Ann. § 39-13-402(a)(1). Robbery, in turn, is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Id. § 39-13-401(a). Tennessee Code Annotated section 39-12-101(a), in pertinent part, provides that a person commits criminal attempt to

commit aggravated robbery when he or she,

acting with the kind of culpability otherwise required for the offense:

(3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

Id. § 39-12-101(a)(3). Additionally, "[c]onduct does not constitute a substantial step under subdivision (a)(3), unless the person's entire course of action is corroborative of the intent to commit the offense." Id. § 39-12-101(b).

As set forth above, the Defendant admitted that he intended to rob Sanchez; armed himself with a gun in order to accomplish the robbery; and assisted Lee and/or McDade in accosting Sanchez in an effort to rob him. His co-defendants' testimony also established the Defendant's active role in attempting to rob Sanchez. The police recovered a gun at the scene that matched the description of the gun the Defendant said that he used. The proof is more than sufficient to support the Defendant's conviction of the attempted aggravated robbery of Sanchez, and the Defendant is entitled to no relief on this basis.

Aggravated Robbery of Stack

The Defendant admitted to acting as the "lookout" during the aggravated robbery of Stack by the Defendant's cohorts. Stack testified that his assailants took a wallet, his iPod, his cell phone, and his car keys. The Defendant also admitted to examining the car keys stolen from Stack and identifying the year of the car to which they belonged, thereby assisting his cohorts in finding and taking the car. Under the theory of criminal responsibility for the conduct of another, a person may be convicted of aggravated robbery when acting solely as the lookout. See, e.g., Eric Sims, 2012 WL 1096097, at *5-6 (evidence sufficient to support defendant's aggravated robbery conviction where defendant acted as lookout and obtained two dollars from the robbery); James Arthur Johnson, 2010 WL 3323796, at *4 (evidence sufficient to support defendant's aggravated robbery conviction where defendant admitted he was aware co-defendant had a gun and planned to rob victims, defendant acted as lookout, and defendant admitted he hoped to be paid for doing so). As set forth above, "[t]he justification for this theory of criminal liability is that, in addition to the primary criminal actor, aiders and abettors should be held accountable for the criminal harms they intentionally facilitated or helped set in motion." Sherman, 266 S.W.3d at 408. As long as the State can prove that a defendant knowingly, voluntarily and with common intent joined with the principal offender in the commission of the crime, the State may seek to hold the

defendant criminally liable as a principal under the theory of criminal responsibility for the conduct of another. Id.; see also Hatcher, 310 S.W.3d at 811. We emphasize that "[i]t is not . . . necessary for one to take a physical part in the crime; encouragement of the principal is sufficient." Sherman, 266 S.W.3d at 408. Thus, the Defendant's statement to the police, corroborated by Stack's testimony, supports his conviction for the aggravated robbery of Stack.

Moreover, McDade testified that the Defendant "ran up on" Stack, and Stack testified that the Defendant was one of the men who patted him down during the robbery. While the Defendant argues that the testimony of these witnesses is not credible, this Court does not second-guess a jury's credibility determinations. We hold that the evidence is sufficient to support the Defendant's conviction of the aggravated robbery of Stack and that the Defendant is entitled to no relief on this basis.

### Theft of Property Over $10,000 from Stack

Although we have determined that the Defendant must be afforded a new trial on the charge of theft of property between $10,000 and $60,000, we nevertheless will assess the sufficiency of the evidence underlying this conviction to facilitate any further appellate review. Our criminal code provides that "[a] person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." Tenn. Code Ann. § 39-14-103. The Defendant was convicted of the theft of Stack's Cadillac.

In his statement to the police, the Defendant described what happened after his cohorts robbed Stack: "They pushed [Stack] back towards the door, Barry picked up the keys, we walked off towards Leandre's grandma's car and we pulled off. We started seeing what they had and I told them let me see the keys that they had and they showed me the keys and I told them it was an '09 and they [sic] lets go get it." The men subsequently located the car and, according to the Defendant, Barton and McDade got in it and drove off. The Defendant did not admit to having taken possession of the car. However, Lee and McDade each testified that the Defendant later got in the Cadillac and drove it to Prescott Place Apartments. The Cadillac later was found abandoned.

This proof is sufficient to establish that the Defendant intended to locate the car to which the stolen car keys belonged. A reasonable inference from the Defendant's interest in locating the car is that he intended to assist in the taking of the vehicle. Two of the Defendant's cohorts testified that the Defendant later took actual possession of the car, driving it to Prescott Place Apartments. Stack testified that he turned the car keys over to the men who robbed him because he was being held at gunpoint and that he later returned to the

-29-

parking lot looking for the Cadillac. This proof permits the reasonable inference that Stack did not consent to having his car taken by the Defendant or any of the Defendant's cohorts. Stack testified that the Cadillac was worth more than $10,000. We hold that this proof is sufficient to support the Defendant's conviction of theft of property between $10,000 and $60,000. Moreover, even if the jury concluded that the Defendant never took possession of the Cadillac, his participation in identifying it for its subsequent taking is sufficient to support his conviction under the theory of criminal responsibility for the conduct of another. The Defendant is entitled to no relief on this basis.

*Sentencing*

In his final issue, the Defendant contends that the trial court erred in imposing consecutive sentences on the basis of finding him to be a dangerous offender. The State disagrees.

A trial court may order consecutive sentences on any one or more of several statutory bases. See Tenn. Code Ann. § 40-35-115(b) (2006). One of those bases is that a preponderance of the evidence establishes that "[t]he defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high." Id. § 40-35-115(b)(4). When imposing consecutive sentences on this basis, the trial court also must find that consecutive sentencing is "reasonably related to the severity of the offenses" and is necessary to protect society from further aggravated criminal conduct by the defendant. State v. Lane, 3 S.W.3d 456, 461 (Tenn. 1999) (citing State v. Wilkerson, 905 S.W.2d 933, 939 (Tenn. 1995)).[7]

In this case, at the conclusion of the sentencing hearing, the trial court ordered the Defendant's five-year sentence for the attempted aggravated robbery conviction and his

___

[7] Our supreme court recently has directed that we review felony sentences imposed pursuant to the 2005 amendments to the 1989 Sentencing Act "under an abuse of discretion standard with a 'presumption of reasonableness.'" State v. Bise, 380 S.W.3d 682, 708 (Tenn. 2012). The effective sentence at issue in Bise was the result of several sentences ordered to be served concurrently. Id. at 687 n.5. The supreme court has not yet addressed directly what impact, if any, its decision in Bise has on our review of consecutive sentences. However, in State v. Caudle, 388 S.W.3d 273, 278-79 (Tenn. 2012), in which the supreme court expressly extended the Bise standard of review to questions related to probation or any other alternative sentences, the court also cited with approval the case of State v. Henry Floyd Sanders, No. M2011-00962-CCA-R3-CD, 2012 WL 4841545 (Tenn. Crim. App. Oct. 9, 2012), perm. app. granted (Tenn. Feb. 15, 2013). Caudle, 388 S.W.3d at 278. Sanders cited to the Bise language in stating the applicable standard of review on the issue of consecutive sentencing. Henry Floyd Sanders, 2012 WL 4841545, at *15. If, indeed, the Bise standard does apply to the review of consecutive sentences, we are led to question the continuing vitality of Wilkerson and Lane regarding their requirement for additional findings by the trial court if the trial court orders consecutive sentences on the basis of the defendant being a dangerous offender.

eight-year sentence for the aggravated robbery conviction to be served consecutively to each other and to the life sentence imposed for the felony murder conviction, for a total effective sentence of life plus thirteen years. The trial court explained:

> Looking at the facts and circumstances of [the attempted aggravated robbery] as it occurred that night – and looking at just those facts – I find that [the Defendant] is a dangerous offender. I find that the circumstances surrounding the commission of the offense are particularly aggravated.
>
> They go to a location specifically looking for a Mexican, and when they get there, he is gunned down at the bottom of the steps before he has an opportunity to enter his home, and then they flee the scene . . . .
>
> . . .
>
> It appears to me, from [the Defendant's] actions that night, that he is a dangerous offender and that the five years consecutive to the life with possibility of parole actually reasonably relates to the offense to which the defendant stood convicted.
>
> It's a shame that Mr. Sanchez had to be murdered for what he had in his pocket. I think it shows callousness on behalf of [the Defendant] and the others involved. You know, if, in fact, you were just going to rob someone, and you had no intentions of hurting them, you would – I would think one would take an unloaded gun, you know, unless you're ready to – unless you're serious – and I find that they were serious this particular night following through with their threats, you would have made sure there could be no possible way that there would be a homicide by assuring that the weapons weren't loaded. So they – I they [sic] each exhibited – and of course we're talking about [the Defendant] now – a callousness – a – well, it just seems hard to imagine that we have people like this in our community that would just rob you and shoot you for what you have in your pocket. So, it's just a – it's a shame, and I think that it reasonabl[y] relates to the offense for which he stands convicted – just based upon the facts as they stood that night – the whole going to rob Mr. Stack – taking his car and then making a bee-line over to these apartments where one of the individuals had indicated he had robbed a Mexican or two before. So, the whole thing just reeks of, I don't know, cruelty, lack of morals – it's just – it's a sad situation.

Explaining its decision to also run the eight-year sentence consecutively, the trial court stated,

> he's a dangerous offender based upon the overall facts set out as the evening progressed. One would wonder why one would even desire to run it concurrent when it was a totally separate situation – totally separate aggravated robbery. It seems like justice would not be done to give [the Defendant] a free aggravated robbery, in essence by allowing it to be run concurrent. I know it's not a mitigating factor or an enhancement factor; it's just common sense to me;[8] but I find that he is a dangerous offender based upon the overall facts and circumstances that occurred that night; the willingness to go out and just rob at random picking out people just because they look like a good target robbing someone, and then going to where they felt like there was another good target – someone who happens to be a Mexican or of Hispanic descent. The overall night was just horrendous; and so I feel like it's justified under the law, and it reasonably relates to the offenses for which he's been convicted.

We review a trial court's decision to impose consecutive sentences for an abuse of discretion. See State v. Adams, 973 S.W.2d 224, 230-31 (Tenn. Crim. App. 1997). It is the Defendant's burden to establish that his sentence is improper. See State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).

The Defendant contends that this Court should reverse the trial court's imposition of consecutive sentences because the trial court did not state explicitly that the extended sentence was necessary to protect the public from further misconduct by the Defendant. We disagree. The above recitation of the trial court's comments makes clear its implicit finding that the public needs prolonged protection from the Defendant's enthusiasm for engaging in illegal activities involving loaded guns. We further reject the Defendant's contention that his advanced age at the time he is initially eligible for parole on his life sentence is a sufficient reason to ignore the Defendant's history of accosting people with loaded guns. Accordingly, we hold that the trial court did not abuse its discretion in determining that consecutive sentences were necessary to protect the public from further criminal conduct by the Defendant.

---

[8] We are constrained to point out that, under this line of reasoning, any concurrent sentence would result in justice "not being done." By providing for a presumption in favor of concurrent sentences, however, our legislature clearly has determined otherwise. See Tenn. Code Ann. § 40-35-115(d) ("Sentences *shall* be ordered to run concurrently, if the criteria noted in subsection (b) are not met, unless consecutive sentences are specifically required by statute or the Tennessee Rules of Criminal Procedure.") (emphasis added).

The Defendant also contends that the trial court committed error in determining that consecutive sentences reasonably related to the severity of the offenses he committed. The Defendant argues, once again, that his role in these crimes was that of a mere facilitator and that consecutive sentences, therefore, are too severe. We disagree, and we continue to reject the Defendant's characterization of his role in these crimes as de minimus. The Defendant shot and killed someone while attempting an armed robbery. The Defendant did so shortly after actively participating in a successful armed robbery. The trial court did not err in this regard.

In sum, we hold that the trial court did not abuse its discretion in ordering partial consecutive service of the Defendant's sentences. The Defendant is entitled to no relief on this basis.

## **Conclusion**

The trial court committed reversible error in refusing to charge the jury on the lesser-included offense of facilitation of theft of property between $10,000 and $60,000 as to victim Stack. Accordingly, we reverse the Defendant's conviction of theft of property between $10,000 and $60,000 and remand this matter for a new trial on that charge. We affirm the trial court's judgments in all other respects.

_____
JEFFREY S. BIVINS, JUDGE